[Cite as *State v. Peyton*, 2017-Ohio-243.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO CA2015-06-112 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 1/23/2017 |
| - vs - | | |
| | : | |
| JAMES V. PEYTON, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2013-07-1033


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Fred Miller, Baden & Jones Building, 246 High Street, Hamilton, Ohio 45011, for defendant-appellant


**M. POWELL, P.J.**

{¶ 1} Defendant-appellant, James V. Peyton, appeals his conviction in the Butler County Court of Common Pleas for possession of marijuana.

{¶ 2} Appellant owns Empire Motors, a car dealership in Middletown, Ohio. In the spring of 2013, Detective Greg Spanel of the Lebanon Police Department and Detective Dan Schweitzer of the Warren County Sheriff's Office were both working with the Warren County

Drug Task Force in an undercover capacity. After a confidential informant ("CI") provided Detective Spanel with information about appellant, the detective introduced the CI to Detective Schweitzer.

{¶ 3} On April 11, 2013, Schweitzer and the CI went to Empire Motors where Schweitzer was introduced to appellant as "Matt." Schweitzer told appellant he was looking to buy a car. Drugs were not discussed during this introductory meeting.

{¶ 4} After the CI arranged another meeting with appellant, Schweitzer and the CI returned to Empire Motors on April 25, 2013. At Schweitzer's request, appellant sold him ten Percocet pills. During the meeting, the CI asked appellant whether "there was any good smoke around," meaning marijuana. Appellant made a telephone call. A man soon arrived and sold seven grams of marijuana to Schweitzer. As Schweitzer was leaving Empire Motors, appellant told Schweitzer he could contact him.

{¶ 5} On May 7, 2013, Schweitzer contacted appellant to purchase 20 Vicodin pills. The two met at Empire Motors where appellant sold 20 Vicodin pills to Schweitzer. The two men did not discuss marijuana during this meeting. Rather, they discussed the quantity of pills appellant could get and where he could get them. Before Schweitzer left, he asked appellant if he could contact appellant for future pill purchases. Appellant agreed. On May 15, 2013, Schweitzer contacted appellant to purchase 31 Vicodin pills. The two met at Empire Motors. Schweitzer ended up buying 51 Vicodin pills.

{¶ 6} On May 21, 2013, Schweitzer contacted appellant to purchase 50 Vicodin pills. The two met at Empire Motors where appellant sold 50 Vicodin pills to Schweitzer. While there, Schweitzer also bought some moonshine from appellant. As they were discussing moonshine, appellant asked Schweitzer at what price Schweitzer sold his marijuana. Schweitzer replied it depended on the quality of the marijuana: $1,200 to $1,300 a pound for commercial grade marijuana, $3,500 to $4,800 a pound for higher grade marijuana.

Appellant then asked, "Is that the hydro?" meaning hydroponic marijuana. Subsequently, appellant told Schweitzer that his stepson, James Smith, a "career guy," might be interested in Schweitzer's marijuana.

{¶ 7} Later in the conversation, appellant shared with Schweitzer "how he used to fool with large quantities of marijuana" and how he once "broke down 480 pounds of marijuana right here" in the office where the two men were sitting: "We moved the desk back, and got a brook out, we swept the floor, and had the bricks, and we broke them down right here." Appellant told Schweitzer he had a partner in the business at the time, their marijuana supplier was from California, and the marijuana would come in on a truck, in a crate box.

{¶ 8} At that point, Schweitzer asked appellant if he was interested in storing 50 to 100 pounds of marijuana at Empire Motors. Appellant replied that his dealership was "hot," meaning it was being watched by the police, but that his stepson might be interested in storing and moving some marijuana. Appellant shared with Schweitzer that he (appellant) had been dealing for 45 years. Subsequently, Schweitzer mentioned storing marijuana at the dealership if appellant was interested, told appellant to think about it, and told him he would pay him a storage fee. As Schweitzer was leaving Empire Motors, appellant approached Schweitzer's car and informed him he had an additional 120 Vicodin pills for sale. Schweitzer agreed to buy 20 additional Vicodin pills.

{¶ 9} On May 30, 2013, Schweitzer contacted appellant to purchase 50 Vicodin pills. During the call, Schweitzer asked appellant if Smith could come to the meeting "so that we could all discuss future marijuana transactions." Schweitzer later went to Empire Motors where he purchased 50 Vicodin pills from appellant. During the meeting, appellant introduced Smith to Schweitzer. In appellant's presence, Schweitzer and Smith discussed storing marijuana at Smith's residence in exchange for $500-$1,000. During their conversation, Smith advised Schweitzer that Smith and appellant had talked about

Schweitzer "in the storage of marijuana."

{¶ 10} On June 10, 2013, Schweitzer went to Empire Motors where he purchased 100 Vicodin pills from appellant. While there, and in appellant's presence, Schweitzer and Smith discussed marijuana. Schweitzer advised Smith that he was expecting a shipment of marijuana and asked Smith whether he was interested in buying 20 pounds from the shipment. The issue of appellant storing marijuana at his dealership was not discussed during this meeting.

{¶ 11} On June 18, 2013, Schweitzer went to Empire Motors where he bought 50 Vicodin pills from appellant. Schweitzer told appellant that he (Schweitzer) would be receiving a shipment of marijuana by week's end. Appellant stated he would be willing to break down the marijuana and agreed to store it at his dealership. Schweitzer told appellant he intended to "keep two to 300 pounds here at the car lot and two to 300 pounds at [Smith's]," and that he would pay appellant $2,000 in storage fee. Appellant then took Schweitzer around the parking lot of the dealership and showed him vehicles where the marijuana could be stored.

{¶ 12} On June 21, 2013, Schweitzer conducted a "reverse buy" operation. Schweitzer had previously arranged to meet appellant at Empire Motors that day to break down 500 pounds of marijuana reportedly shipped from California. Appellant, Schweitzer, and Smith were to take the marijuana out of its shipping crate, put it into duffle bags, and then store it. The marijuana was packed in a crate so that it appeared to have been shipped from California. As was the case in his prior meetings with appellant, Schweitzer was wearing a wireless transmitter that was being monitored by fellow officers. Schweitzer had also arranged for about 20 law enforcement officers from six different agencies to surround Empire Motors and conduct surveillance during the operation. Schweitzer also had search warrants for Empire Motors and appellant's home.

{¶ 13} Prior to driving to Empire Motors, Schweitzer sent a text message to appellant informing him that the shipment of marijuana had arrived, asking appellant if he was ready, and informing appellant he would be at Empire Motors around 10:00 a.m. Appellant "replied back okay." Schweitzer transported the marijuana crate in his pick-up truck. The crate contained several bricks of marijuana as well as four 50-pound black blocks of marijuana.

{¶ 14} Once Schweitzer arrived at Empire Motors, he and appellant unloaded the marijuana from the truck. Schweitzer unloaded the marijuana bricks from the crate and handed them to appellant. In turn, appellant put the marijuana bricks into hockey bags provided by Schweitzer, and then carried the loaded bags into his office. When the two ran out of hockey bags, appellant provided black trash bags. Appellant also removed three of the black blocks of marijuana from the pickup truck and stored them in a hatchback parked on the lot. Schweitzer kept the fourth block, ostensibly to later deliver it in Franklin, Ohio.

{¶ 15} Once in appellant's office, the two men tallied the quantity of marijuana in each bag. The total tally was written on a notepad which was subsequently recovered from the front left fender of a vehicle parked in the garage of Empire Motors. Schweitzer asked appellant where he intended to store the marijuana. Appellant replied he was going to store it in the attic of the dealership, because "it's the safest place." Subsequently, appellant hoisted the bags of marijuana, one at a time, into the attic. After Smith arrived at Empire Motors, appellant assisted in loading the marijuana intended for Smith into Smith's vehicle.

{¶ 16} Schweitzer told appellant that the marijuana would be stored at the dealership for a couple of days and that he would call appellant when he was ready to pick it up. Appellant told Schweitzer that if Schweitzer needed to access the marijuana after hours, he could call Smith who had a key to the premises. Appellant also suggested Schweitzer could pull in his vehicle, pretend to check the oil or jack the vehicle, and then load the marijuana from the attic into Schweitzer's car.

{¶ 17} Schweitzer paid appellant $2,000 in cash for storing the marijuana and left the dealership. About 15 to 20 seconds later, several law enforcement officers arrived at the dealership. Appellant and Smith were arrested; the marijuana and the $2,000 were recovered.

{¶ 18} Appellant was indicted in July 2013 on one count of aggravated drug trafficking for the Percocet sale, six counts of drug trafficking for the Vicodin sales, and one count of marijuana possession for the marijuana appellant received and stored on June 21, 2013. The marijuana possession charge also included several forfeiture specifications. At a jury trial in January 2015, Detectives Spanel and Schweitzer testified on behalf of the state. Appellant did not testify or present witnesses on his behalf. At the close of the evidence, appellant moved the trial court to provide an entrapment instruction to the jury with regard to the marijuana possession charge. The trial court overruled the motion. On January 9, 2015, the jury found appellant guilty as charged and he was subsequently sentenced to an aggregate eight-year prison term.

{¶ 19} Appellant now appeals, raising two assignments of error.

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO INSTRUCT THE JURY REGARDING THE DEFENSE OF ENTRAPMENT.

{¶ 22} Appellant argues the trial court erred when it refused to provide an entrapment instruction to the jury.

{¶ 23} We note at the outset that appellant did not comply with Crim.R. 30 when he moved the trial court to instruct the jury regarding entrapment in an oral request prior to closing arguments. Crim.R. 30(A) provides in pertinent part that "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may

- 6 -

file *written* requests that the court instruct the jury on the law as set forth in the requests." (Emphasis added.) This court has stated that when a defendant fails to request a jury instruction in writing as required by Crim.R. 30(A), a trial court does not err in denying his oral request for such an instruction. *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 36. *See State v. Fanning*, 1 Ohio St.3d 19 (1982), paragraph two of the syllabus. At trial, the state did not oppose appellant's requested entrapment instruction on the ground it did not comply with Crim.R. 30(A), nor does it do so on appeal. However, as discussed below, even if appellant had requested an entrapment instruction in compliance with Crim.R. 30(A), we would still find the trial court did not abuse its discretion in denying the request because the evidence did not support an entrapment instruction.

{¶ 24} Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). Jury instructions are matters left to the sound discretion of the trial court. *State v. Gomez*, 12th Dist. Butler No. CA2012-07-129, 2013-Ohio-2856, ¶ 7. This court reviews a trial court's decision refusing to provide the jury with a requested instruction for an abuse of discretion. *Id.*

{¶ 25} Entrapment is an affirmative defense which a defendant has the burden of proving by a preponderance of the evidence. R.C. 2901.05(A); *Davis*, 2016-Ohio-1166 at ¶ 36. Entrapment exists "where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." *State v. Doran*, 5 Ohio St.3d 187 (1983), paragraph one of the syllabus. However, there is no entrapment when government officials "merely afford opportunities or facilities for the commission of the offense" to a criminal defendant who was predisposed to commit the offense. *Id.* at 192; *Davis* at ¶ 36. Where a person is ready and willing to break the law, the fact that government officials provide a means to do so is not entrapment. *Davis* at ¶ 36. The defendant asserting

the entrapment defense must adduce evidence supporting his lack of predisposition to commit the offense. *Id.*

{¶ 26} A trial court does not err in failing to instruct the jury on an affirmative defense where the evidence is insufficient to support the instruction. *State v. Palmer*, 80 Ohio St.3d 543, 564 (1997); *Davis*, 2016-Ohio-1166 at ¶ 35. In reviewing the record to ascertain the presence of sufficient evidence to support the giving of a proposed jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction. *Id.*

{¶ 27} In *Doran*, the Ohio Supreme Court considered whether Ohio should define entrapment pursuant to the "subjective" or "objective" test. Explaining the distinction between the two tests, the court observed that "the subjective test of entrapment focuses upon the predisposition of the accused to commit an offense whereas the objective or 'hypothetical-person' test focuses upon the degree of inducement utilized by law enforcement officials and whether an ordinary law-abiding citizen would have been induced to commit an offense." *Doran*, 5 Ohio St.3d at 190. In other words, the "subjective" test focus is upon the subjective aspects of an accused's predilection to commit an offense and the "objective" test focus is upon the objective aspects of police conduct to induce an accused to commit an offense. The supreme court adopted the "subjective" test, finding it more reliable because it "properly emphasizes the accused's criminal culpability and not the culpability of the police officer." *Id.* at 192.

{¶ 28} Appellant argues that an entrapment jury instruction was warranted because it was Schweitzer who asked appellant to store marijuana, induced appellant to commit the offense by grooming him over time with increasingly larger pill purchases, and controlled the time, place, and manner of the transaction as well as the amount of marijuana provided to appellant. Obviously, the factual basis supporting appellant's claim of error is entirely focused

upon "the culpability of the police officer." In rejecting the "objective" test of entrapment, the Ohio Supreme Court necessarily rejected the approach taken by appellant in this assignment of error.

{¶ 29} Pursuant to the "subjective" test, there was abundant evidence that appellant was predisposed to commit the offense. The evidence was unequivocal that appellant was engaged in the illegal drug trade, including marijuana, prior to the June 21, 2013 reverse buy operation. During their second meeting on April 25, 2013, appellant demonstrated his ready access to marijuana when, with little notice, he arranged for Schweitzer to purchase marijuana from a third party. Appellant sold Schweitzer ten Percocet pills at this meeting and invited Schweitzer to contact him in the future. Appellant sold pills to Schweitzer on six more occasions prior to June 21, 2013, each time readily accepting payment for the drugs. On one of those occasions, after selling Schweitzer the pre-arranged quantity of 50 Vicodin pills, appellant offered to sell Schweitzer 120 more.

{¶ 30} During their meeting on May 21, 2013, Schweitzer and appellant discussed marijuana. Appellant inquired about the price of Schweitzer's marijuana. Appellant told Schweitzer that his stepson, Smith, was a "career [marijuana] guy" who may have an interest in Schweitzer's marijuana. During their conversation, appellant admitted that he "used to fool with large quantities of marijuana," and, much like the reverse buy that is the subject of this appeal, once "broke down 480 pounds of marijuana" in his office at Empire Motors. Appellant boasted that he had been dealing drugs for 45 years. These comments served as a segue to Schweitzer's inquiry about storing marijuana at Empire Motors. Appellant indicated a reluctance to do so, not because he was disinclined, but because the dealership was "hot." Then, rather than merely demurring and terminating the discussion of storing marijuana, appellant suggested that his stepson, Smith, might be interested in storing marijuana for Schweitzer. Appellant subsequently introduced Smith to Schweitzer to facilitate

the discussion of "future marijuana transactions." Thereafter, appellant was present each time Schweitzer and Smith discussed storing marijuana.

{¶ 31} On June 18, 2013, after Schweitzer told appellant he was expecting a shipment of marijuana by week's end, appellant offered to break down and store the marijuana at his dealership. Demonstrating his competence and ability to store the marijuana, appellant then took Schweitzer around the parking lot of the dealership and showed him vehicles where the marijuana could be stored. Two days later, on the day of the reverse buy operation, Schweitzer sent a text message to appellant informing him he was bringing the marijuana to the dealership that morning. Appellant did not refuse the delivery, but acknowledged he was ready. Appellant readily accepted the $2,000 payment for storing the marijuana.

{¶ 32} Appellant does not claim that he was entrapped into selling pills to Schweitzer. Appellant relies upon the pill transactions only as evidence that Schweitzer was "grooming" him for the later reverse buy. This assignment of error is restricted to appellant's possession of the marijuana he stored. In effect, appellant's argument is that, although he was predisposed to dealing in prescription drugs, he was not predisposed to dealing with marijuana. However, his admissions concerning his past dealings in large quantities of marijuana, his involvement in prior conduct much like that involved with the instant possession of marijuana charge, and his ability to immediately arrange for Schweitzer to purchase marijuana on April 25, 2013, with just a telephone call, belie his argument.

{¶ 33} In applying the subjective test, the Ohio Supreme Court identified some of the relevant factors courts should consider:

> (1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity.

*Doran*, 5 Ohio St.3d at 192.

{¶ 34} Applying those factors to this case, the evidence is uncontroverted that appellant was actively engaged in illegal drug trafficking, had previously dealt in large quantities of marijuana, encouraged and readily accepted Schweitzer's business, professed to have experience and knowledge in preparing for the distribution of large quantities of marijuana, encouraged Schweitzer to engage in marijuana trafficking with his stepson, Smith, a "career [marijuana] guy," had ready access to marijuana and prescription drugs, and displayed a willingness to involve himself in the criminal activity by offering to store the marijuana for Schweitzer.

{¶ 35} Appellant ignores the foregoing as it applies to the affirmative defense of entrapment, other than to say, "there are facts the State could argue to the jury in opposition to the entrapment defense. But that is not sufficient reason to deny the charge altogether." The evidence of Schweitzer's conduct relied upon by appellant as supporting an entrapment instruction has little relevance in applying the "subjective" test. Appellant had an affirmative duty to "adduce evidence supporting his lack of predisposition to commit the offense." *Davis*, 2016-Ohio-1166 at ¶ 36. Appellant presented no evidence supporting his lack of predisposition to commit the offense.

{¶ 36} Application of the "subjective" test of entrapment shows that appellant was ready and willing to break the law and thus, had a predisposition to commit the crime, and that the state, through Schweitzer, merely afforded opportunities for appellant to do so. The record contains no evidence from which reasonable minds might reach the conclusion that appellant was entrapped. Considering the foregoing, appellant was not entitled to a jury instruction on the affirmative defense of entrapment. The trial court, therefore, did not abuse its discretion in declining to provide the instruction to the jury.

{¶ 37} Appellant's first assignment of error is overruled.

{¶ 38} Assignment of Error No. 2:

{¶ 39} APPELLANT'S CONVICTION FOR POSSESSION OF MARIJUANA WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT HE HAD POSSESSION OF THE MARIJUANA.

{¶ 40} Appellant argues his conviction for possession of marijuana is not supported by sufficient evidence and is against the manifest weight of the evidence. Appellant asserts that he never exerted control over the marijuana and never had the opportunity to do so because Schweitzer controlled every aspect of the reverse buy operation and appellant was arrested immediately after the marijuana was delivered.

{¶ 41} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 16. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 42} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *Bradbury* at ¶ 17. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered. *Id.* An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18. A "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 43} Appellant was convicted of possession of marijuana in violation of R.C. 2925.11(A), which provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance[.]" Possession means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

{¶ 44} Possession may be constructive or actual. *State v. Williams*, 12th Dist. Butler No. CA2014-09-180, 2015-Ohio-2010, ¶ 14. "An accused has 'constructive possession' of an item when the accused is conscious of the item's presence and is able to exercise dominion and control over it, even if the item is not within the accused's immediate physical possession." *State v. Jester*, 12th Dist. Butler No. CA2010-10-264, 2012-Ohio-544, ¶ 25. A person may knowingly possess or control property belonging to another; the state need not establish ownership to prove constructive possession. *Williams* at ¶ 14. In addition, two or more persons may have possession of an object together if they have the ability to control it, exclusive of others. *State v. Weckner*, 12th Dist. Brown No. CA2001-06-009, 2002 WL 371948, *2 (Mar. 11, 2002).

{¶ 45} Constructive possession may be proven by circumstantial evidence alone. *Williams* at ¶ 15. Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession. *Id.* The discovery of

readily accessible drugs in close proximity to the accused constitutes circumstantial evidence that the accused was in constructive possession of the drugs. *Id.*

{¶ 46} Upon a thorough review of the record, we find the jury did not lose its way in concluding appellant had possession of the marijuana during the reverse buy operation. The record shows that appellant had dominion and control over the dealership where the marijuana was stored and concealed, and that he was conscious of the marijuana. Appellant removed the marijuana from Schweitzer's truck by loading the marijuana bricks into individual hockey bags and trash bags, by concealing the bags into the attic of his dealership, as it was "the safest place," and by unloading three blocks of marijuana from the truck and concealing them into a hatchback parked on his lot. Appellant accepted the $2,000 payment in consideration for storing the marijuana, thus establishing his possession. Thereafter, Schweitzer left the dealership; 15 to 20 seconds later, law enforcement officers converged on the scene.

{¶ 47} These facts, taken together, show that appellant took delivery of the marijuana and knowingly exercised dominion and control over it, if only for a short time. *See State v. Reyes*, 6th Dist. Wood No. WD-02-069, 2004-Ohio-2217; *Williams*, 2015-Ohio-2010. The crucial issue is not whether the accused had actual physical contact with the article concerned, but whether the accused was capable of exercising dominion and control over it. *State v. Bowerman*, 9th Dist. Medina No. 13CA0059-M, 2014-Ohio-4264, ¶ 7.

{¶ 48} In light of the foregoing, we find that appellant's conviction for marijuana possession is not against the manifest weight of the evidence. Our determination that appellant's conviction is supported by the weight of the evidence is also dispositive of the issue of sufficiency. *Jones*, 2013-Ohio-150 at ¶ 19.

{¶ 49} Appellant's second assignment of error is overruled.

{¶ 50} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.