[Cite as *State v. Gazaway*, 2019-Ohio-5164.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2018-12-236 |
| - vs - | : | O P I N I O N<br>12/16/2019 |
| | : | |
| DONALD T. GAZAWAY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-01-0105

Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Engel & Martin, LLC, Mary K. Martin, 4660 Duke Drive, Suite 101, Mason, Ohio 45040, for appellant

**PIPER, J.**

{¶ 1}  Appellant, Donald Gazaway, appeals his convictions in the Butler County Court of Common Pleas for felonious assault, aggravated burglary, kidnapping, having weapons under disability, and inducing panic, as well as the accompanying firearm specifications.

{¶ 2}  The victim and her son lived in an apartment complex, along with the family's dog.  On the evening of the incident in question, the child was in his mother's bedroom

playing video games when he heard yelling from the living room. The child ran from his mother's bedroom into the living room and saw Gazaway, a man with whom he was familiar, pointing a gun at his mother's head and demanding $10,000. When the child tried to call police from a phone in the apartment, Gazaway ran after the child and threw the phone on the floor breaking it. During this time, the child's mother ran from her home.

{¶ 3} After Gazaway searched the apartment for the woman but could not find her, Gazaway took the child and hid in a closet. Police soon arrived at the apartment complex and the child's mother informed them that Gazaway was inside with her son. The responding officers called the victim's cell phone, which was in the apartment, but Gazaway disconnected the calls and began firing his gun through the closet wall and door.

{¶ 4} Soon thereafter, a SWAT team arrived on scene, including an armored vehicle and multiple officers. Officers then evacuated the other inhabitants of the surrounding apartments. Although no one was shot, bullets pierced the apartment's exterior windows, the SWAT vehicle where officers were located, as well as various parts of the apartment's interior.

{¶ 5} The standoff lasted approximately 30 hours before Gazaway surrendered. Police located three firearms and a multitude of spent and live ammunition in the home. Gazaway was arrested and pled not guilty to the charges, claiming instead, that someone else fired the bullets that pierced the home and SWAT vehicle.

{¶ 6} After a jury trial, Gazaway was convicted of felonious assault, aggravated burglary, kidnapping, having weapons under disability, inducing panic, and multiple accompanying firearm specifications. The trial court sentenced Gazaway to an aggregate term of 41 and one-half years in prison.[1] Gazaway now appeals his convictions and

---

1. The trial court filed a nunc pro tunc sentencing entry reflecting the 41.5 year sentence imposed at the sentencing hearing.

sentence, raising multiple assignments of error, some of which we will combine or discuss out of order for ease of discussion.

{¶ 7} Assignment of Error No. 3:

{¶ 8} THE CONVICTIONS IN THIS MATTER WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 9} Assignment of Error No. 4:

{¶ 10} THE CONVICTIONS IN THIS MATTER WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 11} Gazaway argues that his convictions for felonious assault, kidnapping, and aggravated burglary are not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 12} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Workman,* 12th Dist. Clermont Nos. CA2016-12-082 and CA2016-12-083, 2017-Ohio-8638, ¶ 20. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Watson*, 12th Dist. Warren No. CA2014-08-110, 2015-Ohio-2321, ¶ 22.

{¶ 13} To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 17. An appellate court will overturn a conviction due to the manifest weight of the evidence only in

extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18. A determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency. *State v. Peyton*, 12th Dist. Butler No. CA2015-06-112, 2017-Ohio-243, ¶ 48.

{¶ 14} Gazaway was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which provides, that no person shall "cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." Gazaway was also convicted of aggravated burglary in violation of R.C. 2911.11(A)(2), which provides,

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * the offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 15} Gazaway was also convicted of kidnapping in violation of R.C. 2905.01(B)(2), which provides,

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:
> * * * Restrain another of the other person's liberty.

After reviewing the record, we find that each of Gazaway's convictions are supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 16} During trial, the state offered testimony from the child Gazaway took as a hostage during his standoff with police. The child, who was familiar with Gazaway before the night in question, testified that he saw Gazaway pointing a gun at his mother's head and demanding $10,000 from her. The child also testified that Gazaway followed him when he

ran to call the police and that Gazaway forced him into the closet and began firing his gun once police arrived at the apartment complex. Gazaway then took the child to another closet where he continued to fire different weapons, including an AK-47. Gazaway also took the child into his mother's bathroom and fired the weapon several more times, breaking the toilet and causing bullet holes in the bathroom walls.

{¶ 17} The child also testified that police sent a robot into the apartment to deliver a phone to Gazaway and that Gazaway told him the phone could be an explosive or meant to electrocute them. Gazaway then took the child into the garage out of fear that the robot was going to "rush" them. The child testified that he and Gazaway saw police officers near the door to the garage.

{¶ 18} The child testified that he did not want to stay with Gazaway during the police standoff but did so because he was afraid Gazaway would shoot him. The child explained that Gazaway would carry him on his back through the apartment and stand behind him when police officers were nearby. The child further testified that Gazaway had a gun with him the entire time he was in the apartment, that Gazaway pointed a gun at him, and that he observed Gazaway fire the gun at police officers. The child also testified that he was afraid during the standoff, was scared of being shot if he did not obey Gazaway's commands, and that Gazaway did not let him go despite his asking to be let go. The child testified that the standoff eventually ended when he and Gazaway exited the garage and a SWAT member carried him to safety.

{¶ 19} The state then called a deputy with the Butler County Sheriff's Department who was involved in the incident when he received a dispatch that a female was running through the apartment complex screaming for help. The deputy testified that he and three other deputies responded to the scene and that he made contact with the child's mother. The deputy testified that when he tried to make contact with Gazaway inside the apartment, the

phone calls were disconnected three times and that shots were fired from inside the apartment between the second and third phone calls.

{¶ 20} During the phone calls, the deputy identified himself as a police officer and verified that the child had not been shot. The deputy testified that he and the other deputies immediately called for backup and that a SWAT team arrived.

{¶ 21} The deputy further testified that when he first encountered the child's mother, she was frantic and that she told him "D" was in the apartment with her son. The deputy testified that the woman was wearing a tank top and sweatpants, but no shoes, which alarmed the deputy because there was snow on the ground.[2] During the 13 hours the deputy was on the scene, he did not observe anyone enter or exit the apartment.

{¶ 22} The state next presented testimony from another deputy who was on the scene, and who had positioned himself near the front of the apartment. The deputy testified that when he moved toward the side of the apartment, a shot was fired from inside the apartment. He also heard other gunshots and heard the bullets ricochet in front of his police cruiser. During the time the deputy was on the scene, he did not observe anyone enter or exit the apartment.

{¶ 23} The state also presented testimony from a police captain who was the critical incident manager of the SWAT team deployed to the apartment. The captain testified that he observed gunshot holes through the window of the apartment, and also that he observed a man standing behind the child when the door to the apartment opened for a short time. The captain described the child as being "very scared," and that the child expressed a desire to leave the apartment.

{¶ 24} The captain also testified that when he was sitting in the front driver side of the

---

2. Other witnesses testified that the standoff occurred in January and that the weather was especially frigid during the 30-hour standoff.

armored SWAT vehicle, bullets fired from inside the apartment hit the vehicle, including one that struck the windshield. During the time the captain was in charge of the scene, he did not see anyone enter or exit the apartment.

{¶ 25} The state next called the negotiator who was present on the night of the incident and testified that his goal was to reach a peaceful conclusion to the standoff. In order to do so, he contacted Gazaway multiple times, often ending with Gazaway hanging up the phone. The negotiator testified that at one point during the incident, he was sitting in the SWAT armored vehicle when it was hit by a bullet fired from the apartment. The negotiator testified that the bullet struck the windshield "directly in front of" his face. The negotiator further testified that the SWAT team was eventually able to confine Gazaway and the child to the garage and that he was able to hear the child screaming and speaking frantically.

{¶ 26} The state next called a member of the SWAT team who testified that he observed shots fired from the apartment while he was in position in the garage. The SWAT officer also testified that his team observed Gazaway take the child from the apartment to the garage and that his team was eventually able to contain Gazaway and the child in the garage by wedging the door from the garage to the apartment shut so that Gazaway could not gain reentry.

{¶ 27} The state also called another SWAT team member who testified that he was positioned in the garage when he observed the door open and the child emerge with his small dog. The child, who was surprised to see the SWAT team members, dropped the dog and tried to recapture him before the door to the apartment opened and the child was pulled back inside.

{¶ 28} The SWAT team member also testified that he later observed the child when the team was trying to deliver a phone into the apartment. The team member testified that

the child "looked scared to death," and that when the child looked toward the ground, the SWAT team could see that Gazaway was holding a gun to the back of the child's neck.

{¶ 29} Another SWAT team member also testified for the state that he observed the child and Gazaway sitting in one of the vehicles once the two were in the garage, that the child was crying and scared, and that Gazaway held a gun to the child the majority of the time. The SWAT team member also testified that he made an identification of Gazaway at the scene by comparing the man he saw in the car holding the child at gunpoint with Gazaway's photographs taken by the Ohio Bureau of Motor Vehicles. The team member then made an in-court identification of Gazaway and later testified that he observed Gazaway's face multiple times during the standoff and that he was able to "tell it was [Gazaway]."

{¶ 30} The SWAT team member testified that eventually, the standoff came to an end when Gazaway exited the garage with his hands in the air and his pants around his ankles. The team was able to secure the child's safety and then placed Gazaway in custody.

{¶ 31} The state also presented testimony from a DNA expert who analyzed evidence removed from the apartment after the standoff ended. The expert testified that Gazaway's DNA matched DNA samples taken from evidence retrieved from the apartment.

{¶ 32} When viewed in a light most favorable to the prosecution, the evidence demonstrates that Gazaway committed felonious assault, aggravated burglary, and kidnapping during the standoff with police through his use of a firearm to trespass in the apartment, restrain the child's liberty, and fire weapons multiple times that could have resulted in death or serious harm to the multitude of officers and bystanders. While it is true that no one was injured during the standoff, the jury could infer from Gazaway indiscriminately firing multiple weapons toward officers in an area where he knew they were located, as well as the surrounding circumstances of the standoff itself, that he possessed an

intent to cause serious physical harm to others and took substantial steps toward that end. *See State v. Sizemore*, 12th Dist. Warren No. CA2019-01-006, 2019-Ohio-4400, ¶ 27. ("A criminal attempt occurs when a defendant purposely does or omits to do something which is an act or omission constituting a substantial step in a course of conduct planned to culminate in the commission of a crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose"). As such, Gazaway's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Gazaway's third and fourth assignments of error are overruled.

{¶ 33} Assignment of Error No. 1:

{¶ 34} APPELLANT'S MAXIMUM SENTENCES ARE CLEARLY AND CONVINCINGLY CONTRARY TO LAW.

{¶ 35} Assignment of Error No. 2:

{¶ 36} APPELLANT'S CONSECUTIVE SENTENCES ARE CLEARLY AND CONVINCINGLY CONTRARY TO LAW.

{¶ 37} In his first two assignments of error, Gazaway challenges his sentence.

{¶ 38} As with all felony sentences, we review the trial court's sentencing decision in this case under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 43. Pursuant to that statute, this court may modify or vacate a sentence only if, by clear and convincing evidence, the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law. *State v. Cyrek*, 12th Dist. Butler No. CA2019-02-037, 2019-Ohio-4515. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-

Ohio-2890, ¶ 8. This court may therefore "increase, reduce, or otherwise modify a sentence only when it clearly and convincingly finds that the sentence is (1) contrary to law or (2) unsupported by the record." *State v. Brandenburg*, 146 Ohio St.3d 221, 2016-Ohio-2970, ¶ 1.

{¶ 39} Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. The trial court must find that (1) the consecutive sentence is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2919.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

To impose consecutive terms of imprisonment, the trial court must make findings pursuant to R.C. 2929.14(C)(4) at the sentencing hearing and incorporate the findings in its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37.

{¶ 40} Gazaway essentially argues that his sentence is contrary to law because he did not cause any harm to anyone and he never intended to harm anyone during the standoff. However, and after reviewing the record, we find that the trial court properly sentenced Gazaway.

{¶ 41} Gazaway does not argue that the trial court failed to properly impose postrelease control or that his sentences were not within the permissible statutory range. Instead, Gazaway asserts that the trial court failed to properly consider the purposes and principles of sentencing. However, the trial court noted its express consideration of the statutory requirements of R.C. 2929.11 and R.C. 2929.12 in its sentencing entry and at the sentencing hearing.

{¶ 42} Furthermore, we find that the trial court's sentence is supported by the record. Gazaway, who has an extensive criminal history, held a ten-year-old boy for 30 hours, many times at gunpoint, and used him as a human shield to protect himself from officers trying to end the standoff. During this time, the child cried, screamed, spoke frantically, was afraid, and asked to be let go. However, Gazaway refused to release the child and subjected him instead to repeated close-range gunfire.

{¶ 43} Gazaway used three firearms, one of which was an AK-47, during his standoff. Gazaway's erratic and prolific gunfire could have easily resulted in serious injury or death to the child, as well officers and bystanders. For example, had the SWAT vehicle not been protected with bulletproof glass, one SWAT team member would have been shot in the head. The trial court made specific note of the "terror" Gazaway caused during the standoff, a terror that impacted the child, his mother, residents of the apartment complex, as well as multiple law enforcement officers. The record fully supports the trial court's sentence.

{¶ 44} The trial court also made the proper consecutive sentence findings, as required by statute. Specifically, the court determined that the consecutive nature of the sentences was necessary to protect the public from future crime and to punish the offender and that the sentences were not disproportionate to the seriousness of Gazaway's conduct and the danger it posed to the public. The court also made a finding that Gazaway committed the crimes while on postrelease control from a prior felonious assault conviction and that the

harm from Gazaway's conduct was so great or unusual that a single term did not adequately reflect its seriousness.

{¶ 45} After reviewing the record, we find that the trial court's sentence was not contrary to law, was supported by the record, and that the court made the requisite consecutive sentence findings. As such, Gazaway's sentence is valid and his first and second assignments of error are overruled.

{¶ 46} Assignment of Error No. 5:

{¶ 47} APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 48} Gazaway argues in his final assignment of error that he was denied effective assistance of counsel.

{¶ 49} To prevail on an ineffective assistance of counsel claim, an appellant must show his trial counsel's performance was deficient, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Id.* at 688. To show prejudice, appellant must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694.

{¶ 50} Gazaway asserts that he was denied effective assistance of counsel because counsel did not call the child's mother as a witness and because he did not testify in his own defense. However, decisions specific to calling witnesses is within trial counsel's strategy and will not provide basis for reversal. *State v. Casey*, 12th Dist. Clinton No. CA2017-08-013, 2018-Ohio-2084. There is no indication that had the child's mother testified, she would have exculpated Gazaway in any way or supported his contention that someone else fired the gun from the apartment during the standoff. Nor is there an indication that Gazaway's own testimony would have resulted in a reasonable probability of a different result at trial

particularly where there was overwhelming evidence of his guilt. There was significant testimony from the child, testimony from the officers that no one entered or exited the apartment during the standoff, in-court identification by SWAT team members identifying Gazaway as the person creating the standoff, as well as DNA evidence from the apartment implicating Gazaway.

{¶ 51} Gazaway's arguments that his counsel's representation was deficient and prejudicial is based on speculation as to what testimony *might* have disclosed. However, this testimony could have, just as easily, aided the prosecution in proving its case and there is no indication that the jury would have discounted the testimony from the state's witnesses and believed Gazaway's account of the standoff. Mere speculation and unsupported suggestions of what might have been established does not demonstrate counsel's deficient performance nor the prejudice required to support an ineffective assistance of counsel claim. As such, Gazaway's final assignment of error is overruled.

{¶ 52} Judgment affirmed.

RINGLAND, P.J., and M. POWELL, J., concur.