[Cite as *State v. Kyles*, 2023-Ohio-489.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NOS. CA2021-11-141 |
| | | CA2021-11-142 |
| Appellee, | : | |
| | | O P I N I O N |
| | : | 2/21/2023 |
| - vs - | | |
| | : | |
| CAMERON S. KYLES, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2019-06-0862; CR2019-10-1671


Michael T. Gmoser, Butler Clermont County Prosecuting Attorney, and Willa Concannon, Assistant Prosecuting Attorney, for appellee.

Yavitch & Palmer, Co., L.P.A., and Stephen E. Palmer, for appellant.


**M. POWELL, P.J.**

{¶ 1} Appellant, Cameron Kyles, appeals his conviction in the Butler County Court of Common Pleas for participating in a criminal gang and the gang specification attached to eight felonious offenses. This case involves two criminal gangs in Middletown, Ohio, the Crips and the Bloods.

{¶ 2} On June 26, 2019, appellant was indicted in Case No. CR2019-06-0862 on

one count of participating in a criminal gang. The indictment stemmed from a video streamed on Facebook Live showing appellant burning a teddy bear he had taken from a memorial for Blood gang member Joseph Davis (who had been murdered by Crip gang member Gonnii White). During the video, appellant is seen displaying Crip hand signs. On October 18, 2019, appellant was indicted in Case No. CR2019-10-1671 on two counts each of aggravated murder, murder, aggravated robbery, aggravated burglary, and felonious assault, and one count of having weapons while under disability. With the exception of the weapons under disability count, all the offenses in Case No. CR2019-10-1671 were accompanied by firearm and gang specifications. The indictment stemmed from appellant's involvement in the October 12, 2019 murder of Michael Stewart, a marijuana dealer and Blood gang member.

{¶ 3} Appellant entered not guilty pleas to all charges and the indictments were consolidated for trial. Appellant moved to suppress the statements he made to police during interviews. In particular, appellant argued that his I.Q. of 66 prevented him from making a knowing and intelligent waiver of his *Miranda* rights. A suppression hearing was held before the trial court. Detective Stephen Winters testified, and the pertinent portion of appellant's recorded interviews was played and admitted into evidence. On September 23, 2020, the trial court denied appellant's motion to suppress.

{¶ 4} The consolidated cases proceeded to a jury trial on August 23, 2021. Several witnesses testified on behalf of the state, including Gamareon Campbell, Stephen Kubaska, and Detective Kristi Hughes of the Middletown Police Department. Appellant did not testify or present witnesses on his behalf. However, his October 14, 2019 interviews with police were played during the state's case-in-chief and admitted into evidence. The trial testimony revealed the following facts.

{¶ 5} On the afternoon of October 12, 2019, Campbell, Camron Pawlowski, and Joseph Boggs went to Stewart's home and purchased marijuana from him. The trio then picked up appellant and all four returned to Pawlowski's home. While there, Pawlowski's mother took a photograph of the four; appellant and Pawlowski are flashing Crip hand signs; appellant is wearing a white sweater with a red strip on the sleeves. The four planned to rob Stewart. Appellant was seeking to join a Crip sub-gang known as "8-ball mafia" and initiation required that he commit a robbery. In preparation for the robbery, Boggs provided appellant with a black 9 mm handgun. Pawlowski provided appellant with clothing to wear— grey sweatpants, a black hooded jacket with lettering on it, and white Nike Air Force 1 sneakers.

{¶ 6} The four drove to Stewart's home around 9:30 p.m. Upon arrival, Campbell went to Stewart's home and purchased marijuana. As Campbell was leaving Stewart's home, he saw appellant, with the outline of a handgun in his pocket, entering Stewart's home alone. Campbell heard gunshots as he returned to the car. Within seconds, appellant ran to the car with a handgun in his hand, a bag of marijuana, and cash. Appellant asked, "Am I 8-ball yet"? Pawlowski replied affirmatively. Appellant bragged that Stewart tried to get up but that he had repeatedly shot him. Appellant and Pawlowski wrapped the handgun in the white sweater appellant had worn earlier and hid it behind a church.

{¶ 7} The four returned to Pawlowski's home where appellant showered, changed clothes, and put the clothes he wore to kill Stewart in the washing machine. Pawlowski divided the blood-stained cash between the four but kept the bag of marijuana and put it in his bedroom. Appellant and Pawlowski subsequently retrieved the handgun and Pawlowski hid it in the woods behind his house. Later that evening, appellant visited his friend, Stephen Kubaska. Kubaska recalled that appellant had blood-stained cash and was

wearing a GPS ankle monitor. Appellant told Kubaska that he had shot someone four times and killed that person.

{¶ 8} Four 9 mm shell casings and one bullet were recovered from the scene of Stewart's murder. A black 9 mm Smith & Wesson semiautomatic pistol wrapped in a white sweater was recovered from the woods behind Pawlowski's home. The sweater was identical to the one worn earlier by appellant as depicted in the photograph taken by Pawlowski's mother. Firearms testing revealed that the bullet and shell casings found at Stewart's home were fired from the 9 mm Smith & Wesson pistol police had recovered from behind Pawlowski's home. Police searched Pawlowski's home and recovered a bag of marijuana which contained Stewart's DNA, a 9 mm silver cartridge consistent with the ammunition used to kill Stewart, $300 in cash which testing found to have the presence of blood, and a pair of white Nike Air Force 1 sneakers which tested presumptive for blood. Police recovered a black hooded jacket with lettering on it and an elastic waist toggle from Pawlowski's washing machine. From Kubaska's home, where appellant was arrested, police recovered blood-stained cash which DNA testing determined to be Stewart's blood.

{¶ 9} Video footage was obtained from Stewart's surveillance camera. The video depicted the killer in Stewart's home for about 30 seconds. The killer was dressed in a dark hooded jacket with lettering on the front and an elastic waist toggle and was wearing white Nike Air Force 1 sneakers. The killer's height, weight, and nose matched those of appellant. Data from the GPS ankle monitor worn by appellant revealed that he was within 27 feet of Stewart's home at the time of the murder.

{¶ 10} After his arrest, appellant was read his *Miranda* rights and confessed to killing Stewart. Appellant stated he killed Stewart to "earn his stripes" because the Crips "want to have a body on everybody's record." Appellant stated he had been a Crip gang member

for "like four" years. Appellant admitted that he and Pawlowski had been discussing robbing Stewart for months. On the day of the murder, appellant stated that Pawlowski gave him a black handgun and that he changed into a black hoodie, pants, and white Nike Air Force 1 sneakers before going to Stewart's home. Appellant admitted that he intended to kill Stewart before he got there and detailed the robbery and his shooting Stewart.

{¶ 11} Detective Hughes is an expert on Middletown, Ohio gangs. She testified that the Crips are the most violent gang in Middletown, are comprised of mostly black male juveniles, and had two sub-gangs in 2019: the Roadrunners and a newer sub-gang, the 8-ball mafia. The Crip hand signs are a "C," or a "B" and "K" for "blood" and "killer"; their colors are black and blue. Initiation into the Crips requires commission of a violent felony such as murder, robbery, or assault. Detective Hughes also testified that a criminal gang has a leader, also known as the shot caller, a gun handler, and soldiers/shooters. The Roadrunners served as the soldiers/shooters for the Middletown Crips. In 2019, Pawlowski was the shot caller for the 8-ball mafia; appellant, White, Boggs, and Campbell were Roadrunners. The Bloods are the Crips' rival gang in Middletown. Stewart was a Blood gang member.

{¶ 12} Detective Hughes also testified about her interview of appellant in May 2019 concerning the destruction of the teddy bear removed from the memorial for Blood gang member Davis. Appellant admitted he had removed a teddy bear from Davis' memorial and then live streamed himself burning it while flashing Crip hand signs. The interview was played to the jury and admitted into evidence.

{¶ 13} On August 27, 2021, the jury returned guilty verdicts on all counts and specifications of the indictments. Appellant was sentenced to an aggregate prison term of 50-53 years.

{¶ 14} Appellant now appeals, raising ten assignments of error. For ease of discussion, the assignments of error will be addressed out of order, and the first and second assignments of error will be addressed together.

{¶ 15} As conceded by appellant in his third through eighth assignments of error, he did not object to (1) the trial court's failure to instruct the jury on accomplice testimony, (2) Detective Hughes' expert and law enforcement opinions on the credibility of Campbell, (3) the detective's hearsay testimony that sought to establish essential elements of the offenses, (4) the detective's expert testimony in violation of Crim.R. 16(K), (5) improper testimony, comments, and arguments regarding appellant's post-arrest, post-*Miranda* silence, and (6) his appearing at trial wearing jail garb. He has therefore waived all but plain error as to those issues.

{¶ 16} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." On appeal, the accused bears the burden of proving plain error in the record. *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, ¶ 32. In addition to establishing an obvious defect in the trial proceedings, the accused must show that the error prejudiced him, that is, that there was a reasonable probability that but for the error, the results of the proceeding would have been different. *Id.* at ¶ 32-33. Even "[i]f the accused shows that the trial court committed plain error affecting the outcome of the proceedings, an appellate court is not required to correct it[.]" *Id.* at ¶ 34. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *Id.*

{¶ 17} Assignment of Error No. 10:

{¶ 18} THE COURT IMPROPERLY DENIED APPELLANT'S MOTION TO

SUPPRESS HIS STATEMENTS *MIRANDA v. ARIZONA*, AS HIS WAIVER WAS NOT KNOWING, INTELLIGENT, AND VOLUNTARY. IT THUS DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND VIOLATED HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 19} Appellant argues that the trial court erred in denying his motion to suppress the statements he made to police because the waiver of his *Miranda* rights was not knowingly and intelligently made. Appellant raises two issues for review.

{¶ 20} Appellant was interviewed three times: once on October 13, 2019 (the "first interview"), the morning after the murder, and twice on October 14, 2019. During the first interview, Detective Winters informed appellant that several of his accomplices had given written statements, obtained identifying information from appellant, and then began advising appellant of his *Miranda* rights. Appellant requested an attorney. The detective immediately stopped the interview, and then informed appellant he was going to take him back to jail and book him for aggravated murder. The detective further informed appellant that if he changed his mind, he could call the detective or send him a kite. Within one hour, appellant told a corrections officer that he wished to speak with Detective Winters. The corrections officer notified Detective Winters of this by email.

{¶ 21} The next day, on October 14, 2019, Detectives Winters and Hughes twice interviewed appellant. At the outset of the morning interview (the "second interview"), appellant confirmed he did ask to speak with Detective Winters, signed the corrections officer's email to confirm the same, and executed a written *Miranda* waiver. He then fully confessed his crimes, speaking virtually uninterrupted for more than ten minutes. The detectives initiated a lunch break after one hour and ten minutes. After lunch, a second

*Miranda* waiver was executed and the interview continued for an additional 30 minutes (the "third interview").

{¶ 22} Following a suppression hearing during which the *Miranda*-related portion of the three interviews was played, the trial court denied appellant's motion to suppress, concluding that under "the totality of the circumstances," appellant "knowingly, intelligently, and voluntarily" waived his *Miranda* rights. The trial court found that "there certainly is no guideline that someone in that range of having an IQ in the 60s is not able to do the things that we're looking for here. To understand, to enter into a conversation, or an interview, knowing what's going on, and being intelligent to the extent that the person understands and is entering into it voluntarily."

{¶ 23} Appellate review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313, ¶ 11. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard. *Id.*

{¶ 24} "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34; *Miranda v. Arizona,* 384 U.S. 436, 478-479, 86 S.Ct. 1602 (1966). A suspect may effectively waive his or her *Miranda* rights only if the waiver is made voluntarily, knowingly, and intelligently. *State v. Dailey*, 53

Ohio St.3d 88, 91 (1990). Whether there is a valid waiver of *Miranda* rights involves a dual inquiry. *State v. Green*, 12th Dist. Fayette No. CA2021-03-009, 2022-Ohio-101, ¶ 9.

{¶ 25} First, the waiver of the *Miranda* rights must have been a voluntary exercise of will rather than the product of intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986); *Green* at ¶ 10. A suspect's waiver of his or her *Miranda* rights "is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.). *Wesson* at ¶ 35. Appellant does not claim there was any coercive police conduct and Detective Winters' testimony and the recorded interviews of appellant presented at the suppression hearing plainly show that appellant's waiver of his *Miranda* rights was voluntary.

{¶ 26} Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Burbine* at 421; *Green*, 2022-Ohio-101 at ¶ 11. Whether a waiver was knowing and intelligent is a factual issue that must be determined based upon the totality of the circumstances surrounding the interrogation. *State v. Goodwin*, 8th Dist. Cuyahoga No. 99254, 2013-Ohio-4591, ¶ 37. This includes evaluation of "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Green* at ¶ 11. A suspect's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights. *Goodwin* at ¶ 38. Rather, a suspect's low intellect is but one of many factors under the totality of circumstances that a court must consider in assessing the voluntariness of a *Miranda* waiver or confession. *Id.*

{¶ 27} In his first issue for review, appellant challenges the trial court's denial of his

motion to suppress, arguing the court gave "little or no consideration to whether the [*Miranda*] waiver was knowing and intelligent," instead focusing on voluntariness. Appellant asserts that the trial court "improperly discounted the importance of [his] intellectual deficiencies" in view of his I.Q. of 66, which was documented in a competency report.

{¶ 28} Regarding appellant's I.Q. of 66, which the state does not dispute, we note that appellant was examined by two separate psychologists: (1) in the summer of 2019 by Dr. Joy McGhee in the case of the burning of the teddy bear, and (2) in December 2019 by Dr. Bobbie Hopes in the murder case. Dr. McGhee's report, which presumably found that appellant had "an IQ in the extremely low range of functioning," was never introduced or admitted into evidence. Dr. Hopes' report was admitted as a court exhibit during a competency hearing on January 7, 2020. It makes no mention of appellant's I.Q. Neither psychologist nor an expert testified at the suppression hearing. Defense counsel asked the trial court to take notice of the two competency reports. After the trial court observed defense counsel's failure to introduce the reports, the state informed the court that the parties had stipulated to a competency report on January 7, 2020. Such report would be that of Dr. Hopes.

{¶ 29} We find that appellant's waiver of his *Miranda* rights was knowingly and intelligently made. The requisite level of comprehension needed to waive one's *Miranda* rights "does not require that a criminal suspect know and understand every possible consequence of a waiver of [one's] Fifth Amendment privilege." *Colorado v. Springs*, 479 U.S. 564, 574, 107 S.Ct. 851 (1987); *Dailey*, 53 Ohio St.3d at 92. Appellant's behavior during the three interviews belies his claim that his *Miranda* waiver was not knowingly and intelligently made. As Detective Winters began advising appellant of his *Miranda* rights during the first interview, appellant quickly invoked his right to counsel. Within an hour of

the first interview, appellant initiated the second interview. The detective readvised appellant of his *Miranda* rights prior to commencing the second and third interviews. As the detective read the *Miranda* warnings, appellant followed along with a written *Miranda* form. Appellant indicated he understood those rights, and executed a written waiver. An accused's signed waiver form is strong proof of the validity of the waiver. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, ¶ 89. The recorded interviews do not suggest that appellant was confused or did not understand the rights involved and the consequences of waiving those rights.

{¶ 30} Likewise, the totality of the circumstances does not support appellant's claim that his "intellectual deficiencies" hindered or prevented him from knowingly and intelligently waiving his *Miranda* rights. Contrary to appellant's assertion, the trial court expressly considered but rejected the argument that appellant's low I.Q. prevented him from making a knowing and intelligent *Miranda* waiver. Moreover, whether appellant has an I.Q. of 66, a suspect's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights. *State v. Lynn*, 7th Dist. Belmont No. 11 BE 18, 2011-Ohio-6404, ¶ 14. Ohio courts have found valid *Miranda* waivers where the suspects had comparable I.Q.s to appellant's and low reading levels. *See, e.g., Dailey,* 53 Ohio St.3d at 92 (finding that a suspect with an I.Q. of 71, a word identification below the second grade level, and a reading comprehension below the third grade level knowingly and intelligently entered a *Miranda* waiver); *State v. Jenkins*, 15 Ohio St.3d 164, 233 (1984) (finding valid waiver where the suspect had a low I.Q.); *State v. Edwards*, 49 Ohio St.2d 31, 39 (1976) (finding that the suspect's waiver was intelligent even though the suspect had a low I.Q. and a second-grade reading level); *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 30 (finding no *Miranda* violation where the suspect with an I.Q. of 67 confessed to his crime).

{¶ 31} Here, appellant responded appropriately to police questioning during the interviews and his demeanor was reflective of a normal 18-year-old man as opposed to a feebleminded person with intellectual deficiencies. Appellant told the detectives that he was about to graduate from high school, could read and write, and that he wrote rap songs, and demonstrated his savvy by suggesting a controlled call to incriminate the individuals who had implicated him. Dr. Hopes' report provides that appellant demonstrated adequate reading and comprehension during his December 2019 evaluation, that he read an eighth-grade-level statement without error and demonstrated adequate comprehension, and that his vocabulary, sentence structure, grammar, and use of abstract verbal concepts were above average for his age. Appellant's invocation of his right to counsel during the first interview is also strong evidence that he understood his *Miranda* rights.

{¶ 32} In light of the foregoing, the trial court did not err in finding that appellant's waiver of his *Miranda* rights was voluntarily, knowingly, and intelligently entered.

{¶ 33} In his second issue for review, appellant argues that his statements to police should have been suppressed because Detective Winters improperly continued questioning him after he asserted his right to counsel during his first interview. Appellant asserts that the detective initiated the second interview because his conduct and statements to appellant after the latter invoked his right to counsel was a police "tactic designed to instill fear and provide a lifeline for relief. And it worked. [Appellant] took the bait and requested the second interview in less than two hours."

{¶ 34} After appellant invoked his right to counsel during the first interview, Detective Winters immediately stopped the interview and then informed appellant,

> Well, here is the situation. I will let you finish your cigarette, then
> I'm charging you with aggravated murder, and I'm going to lock
> you up, because I have enough information now[.]

- 12 -

So, go ahead and take another puff. Stand up, let's put—put the cuffs back on you. Okay. Go ahead and have a seat there.

So here is what we're going to do, I'm going to have someone come in and get you, and then we will just take you on back to the jail and book you for aggravated murder. And if you want to talk to me—you said you wanted your lawyer, that's fine. If you want to talk to me later, just give me a call or write me a kite or something like that.

{¶ 35} It is well established that "an accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880 (1981). In other words, suspects who invoke their *Miranda* rights remain free to change their minds. A suspect may initiate or reinitiate his or her own interrogation through a third party. *See State v. Van Hook*, 39 Ohio St.3d 256 (1988). Moreover, after a suspect invokes his right to counsel, the police remain free to converse with the suspect about routine incidents of the custodial relationship. *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 92, citing *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir.2015).

{¶ 36} Such is the case here. Once appellant invoked his right to counsel in the first interview, Detective Winters stopped the interview and briefly conversed with appellant about routine incidents of the custodial relationship, to wit, that appellant would be charged with aggravated murder and taken back to the jail, and that he could contact the detective if he wished to speak with him. The record plainly shows that appellant himself initiated "further communication, exchanges, or conversations" with the detective through a third party, a corrections officer, on October 13, 2019, after some time for reflection. The second interview did not take place until the next morning, providing appellant ample time to

reconsider his decision to speak with the detective. At the outset of that interview, appellant confirmed he did ask to speak with Detective Winters, signed the corrections officer's email to confirm the same, and executed a written *Miranda* waiver. We find no merit to appellant's argument under his second issue for review.

{¶ 37} In light of the foregoing, we find the trial court did not err in denying appellant's motion to suppress his statements to police. Appellant's tenth assignment of error is overruled.

{¶ 38} Assignment of Error No. 5:

{¶ 39} THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING TESTIMONY OF APPELLANT'S POST-ARREST, POST-*MIRANDA* SILENCE, IN VIOLATION OF APPELLANT'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 40} Appellant argues the trial court committed plain error by permitting the prosecution to present evidence of appellant's invocation of his right to speak to an attorney.

{¶ 41} As stated above, appellant had three interviews with the police, one on October 13, 2019, and two on October 14, 2019. At trial, the prosecutor briefly elicited from Detective Hughes that appellant "invoked his rights to speak with a lawyer" during the first interview but later asked to speak with the detectives and confessed the following day. Then, during the state's rebuttal to appellant's closing arguments, the prosecutor stated,

> On October 13th when he was first arrested, [appellant] invoked his rights, and they terminated the interview. * * * Camron Pawlowski didn't invoke his rights. Joseph Boggs didn't invoke his rights. Gamareon Campbell didn't invoke his rights. None of those guys apparently were smart enough to figure out how to terminate the interview. The only person who figured out how to terminate the interview was this guy [appellant], the dumb guy, the patsy, the fall guy.

{¶ 42} The state's use at trial of a defendant's post-arrest, post-*Miranda* silence as substantive evidence of guilt or for impeachment purposes violates the Fifth and Fourteenth Amendments to the United States Constitution. *Doyle v. Ohio*, 426 U.S. 610, 618-619, 96 S.Ct. 2240 (1976) (the accused testified); *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634 (1986) (the accused did not testify); *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 15-18. "However, *Doyle* also expressly recognizes that a prosecutor's reference to a defendant's post-*Miranda* silence may *properly* be made where it is *not* 'used to impeach' the defendant's 'exculpatory story,' or as substantive evidence of guilt, but rather to respond to some contention of the defendant concerning his post-arrest behavior." (Emphasis sic.) *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir.2008), citing *Doyle* at 2245, fn. 11 (noting that a defendant's post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and challenge the defendant's testimony as to his behavior following arrest).

{¶ 43} We find no plain error. Given appellant's confession in his second interview and the overwhelming evidence of his guilt, Detective Hughes' brief reference to appellant's silence during his first interview did not prejudice appellant. Appellant has not shown that but for the reference to his invocation of his right to counsel, the outcome of his jury trial would have been different.

{¶ 44} We further find that the prosecutor's brief reference to appellant's invocation of his right to remain silent does not violate *Doyle*, *Greenfield*, or *Leach*. At trial, defense counsel's strategy was to portray appellant as someone having intellectual deficiencies and who was used by Pawlowski, Boggs, and Campbell as a "dumb" "patsy" and their "fall guy" for Stewart's murder. Defense counsel again referred to "the perfect patsy" during closing arguments. On rebuttal, the prosecutor pointed out that of the four individuals involved in

Stewart's murder, only appellant was smart enough to invoke his right to remain silent and terminate his first interview. That is, the prosecutor's argument was to rebut the defense claim that appellant was an unwitting patsy unable to think for himself. The rebuttal argument was not an assertion or suggestion that the jury should infer appellant's guilt directly from his post-arrest, post-*Miranda* silence as a basis of conviction. *See Martinez-Larraga*, 517 F.3d at 268-269. Moreover, in light of all the evidence presented at trial, we cannot conclude that the outcome of the trial clearly would have been different but for the prosecutor's rebuttal remark concerning appellant's invocation of his right to counsel.

{¶ 45} In light of the foregoing, the trial court's admission of Detective Hughes' testimony and the prosecutor's rebuttal statement regarding appellant's post-arrest, post-*Miranda* silence was not plain error. Appellant's fifth assignment of error is overruled.

{¶ 46} Assignment of Error No. 7:

{¶ 47} THE TRIAL COURT ERRED (PLAIN OR OTHERWISE) BY ALLOWING APPELLANT TO APPEAR IN TRIAL WEARING A JAIL UNIFORM AND THUS DEPRIVED HIM OF HIS PRESUMPTION OF INNOCENCE, HIS RIGHT TO A FAIR TRIAL, AND EQUAL PROTECTION OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 48} Appellant argues he was compelled to appear in jail clothing at trial in violation of *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691 (1976). The record shows that on the first day of his five-day jury trial, appellant was wearing the jail-provided "court uniform," a generic two-piece sweatsuit, because the jail had misplaced the civilian clothes he intended to wear at trial. The sweatsuit worn by appellant was not the bright orange or yellow Butler County jail uniform and did not bear any markings identifying it as jail clothing. The

prosecutor brought the issue to the trial court's attention after voir dire and outside the jury's presence. The trial court asked defense counsel whether arrangements could be made for appellant's family to provide civilian clothing. Counsel replied he had not had an opportunity to speak with appellant's family. Subsequently, appellant's mother appeared before the trial court and informed the court she would provide civilian clothes. The colloquy indicates she would do so at the end of the day. Thereafter, without objections from appellant, the trial proceeded with appellant dressed in the sweatsuit. On the second day and for the remainder of the trial, appellant wore his own clothes.

{¶ 49} The United States Supreme Court held in *Estelle* that a defendant's right to due process may be violated if the defendant is compelled to stand trial before a jury while wearing identifiable jail clothing. *Estelle* at 504. "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.* at 504-505. However, the Supreme Court refused to establish an across-the-board rule that a conviction must be overturned, under any circumstances, when the accused wears jail clothing at trial. *Id.* at 506-508. The Court further held that "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Id.* at 512-513.

{¶ 50} In a similar case, we recently held that a defendant was not compelled to appear in identifiable jail clothing at trial where

> the record belies Jarmon's claim that he was wearing identifiable jail clothing. Based on the trial transcript, it appears that Jarmon was wearing gray sweat clothes, as this is what several witnesses described him as wearing. Even if the gray sweat clothes could be said to suggest jail clothing, Jarmon failed to demonstrate that this is what he was compelled to wear. At one point, the trial court asked defense counsel if Jarmon was going to have "different clothing," and counsel replied that he was unsure, saying that he did not know "where things stood." Neither this nor anything else in the record suggests that

Jarmon was forced to wear the clothing that he did. And Jarmon never objected to wearing the clothing in front of the jury.

*State v. Jarmon*, 12th Dist. Butler No. CA2021-08-091, 2022-Ohio-2327, ¶ 41.

{¶ 51} Such is the case here. Appellant wore a generic plain sweatsuit without any markings identifying it as jail clothing on the first day of trial and civilian clothing for the remainder of the trial. Appellant fails to show he was compelled to wear the sweatsuit. Appellant did not object to proceeding with the trial and did not seek a continuance. Defense counsel's only remark concerning proceeding with the trial with appellant wearing the sweatsuit on the first day of trial was to state, "The suit is no longer available to him, so this is what we're stuck with." The evidence of appellant's guilt was overwhelming, and appellant has not demonstrated that the outcome of his trial would have been different had he started the trial in civilian clothes. Accordingly, the trial court did not commit error, let alone plain error, by allowing appellant to appear in the jail-provided generic sweatsuit on the first day of his jury trial. *Estelle*, 425 U.S. 501; *Jarmon* at ¶ 41-42; *State v. Flowers*, 8th Dist. Cuyahoga No. 91864, 2009-Ohio-4876.

{¶ 52} Appellant's seventh assignment of error is overruled.

{¶ 53} Assignment of Error No. 3:

{¶ 54} THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY ON ACCOMPLICE TESTIMONY AS MANDATED BY R.C. 2923.03(D) AND BY FAILING TO INTERVENE AND CORRECT THE PROSECUTOR'S IMPROPER STATEMENTS AND ARGUMENTS TO THE JURY. THE COURT THEREBY DEPRIVED APPELLANT OF HIS RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 55} Appellant argues the trial court committed plain error when it failed to instruct

the jury on the accomplice testimony of Campbell as required by R.C. 2923.03(D).

{¶ 56} R.C. 2923.03(D) provides that when an accomplice of a defendant testifies against the defendant, the trial court, "when it charges the jury, shall state substantially the following":

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

{¶ 57} In determining whether a trial court committed plain error by failing to give the jury an accomplice instruction under R.C. 2923.03, an appellate court examines several factors. Specifically, the appellate court looks to the record to determine whether the defense was permitted wide latitude in cross-examining the accomplice, whether the details of the accomplice's plea agreement were presented to the jury, whether the trial court's general instructions informed the jury how to weigh the credibility of the witnesses and included much of the substance of the R.C. 2923.03(D) accomplice testimony instruction, and whether the accomplice's testimony was favorable to the defendant, justifying defense counsel's failure to request the required instruction as a tactical decision, or whether overwhelming evidence established the defendant's guilt. *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, ¶ 83; *State v. Davis*, 9th Dist. Summit No. 22395, 2005-Ohio-4083, ¶ 16; *State v. Riley*, 5th Dist. Muskingum No. CT2012-0022, 2013-Ohio-1332, ¶ 24.

{¶ 58} Applying the *Yarbrough* factors, we find no plain error. The jury heard that in exchange for Campbell testifying against appellant at trial, he was not charged with aggravated robbery and aggravated burglary and was only charged with murder to which

he pled guilty, he was not bound over as an adult to the common pleas court, and he was committed to the Ohio Department of Youth Services for a maximum period of his 21st birthday (Campbell was then 17 years old). Defense counsel was permitted wide latitude in cross-examining Campbell, including regarding his credibility and the favorable terms of his plea agreement. The trial court provided the standard jury instruction regarding the credibility of witnesses. While Campbell's testimony was unfavorable to appellant, overwhelming evidence established appellant's guilt. Appellant confessed to fatally shooting Stewart and taking cash and marijuana from him. Appellant's statements to police were consistent with Campbell's testimony, and appellant's confession and Campbell's testimony were both consistent with the physical evidence collected during the investigation of Stewart's murder. It is unlikely that giving the accomplice-testimony jury instruction would have altered the outcome of the trial. Therefore, the trial court's failure to give the jury instruction was not plain error. *See Riley*; *State v. Brownlee*, 8th Dist. Cuyahoga No. 105116, 2018-Ohio-739.

{¶ 59} Appellant also argues that the prosecutor compounded the trial court's failure to provide the jury instruction by inaccurately stating during voir dire that the same tests of credibility apply to accomplice testimony and by minimizing Campbell's status as an accomplice during closing argument.

{¶ 60} However, the prosecutor prefaced his voir dire comment about accomplice credibility by stating that jurors "should be initially somewhat skeptical of an accomplice or somebody who assisted the defendant in committing a crime" but that "you're still supposed to apply the same test[s]" to evaluate an accomplice's credibility that are used to evaluate any witnesses' credibility. The prosecutor's comment was a fair statement of the law. Moreover, during closing arguments, the prosecutor rebutted appellant's attack on

Campbell's credibility by noting that Campbell's testimony was consistent with the other evidence, including appellant's confession.

{¶ 61} In light of the foregoing, the trial court's failure to give the accomplice-testimony jury instruction was not plain error. Appellant's third assignment of error is overruled.

{¶ 62} Assignment of Error No. 4:

{¶ 63} THE TRIAL COURT ERRED BY ADMITTING IMPROPER EXPERT AND LAW ENFORCEMENT OPINIONS ON CREDIBILITY IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHTS OF CONFRONTATION AND DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 64} Campbell was interviewed by Detectives Winters and Hughes the day after Stewart's murder. On cross-examination, Campbell admitted that he lied to the detectives during his interview; defense counsel contended that Campbell's plea agreement with the state gave him a motive to lie during his testimony. To rehabilitate Campbell, the state elicited testimony from Detective Hughes that, in her experience as a gang specialist, it is not unusual for gang members to lie during police interviews, and that a subsequent statement Campbell made to the detective was consistent with his trial testimony. Appellant argues that Detective Hughes' reference to Campbell's subsequent statement was inadmissible hearsay under Evid.R. 801 and improper vouching, and therefore, the trial court committed plain error by allowing Detective Hughes to vouch for and opine on the credibility of Campbell.

{¶ 65} "Hearsay" is a statement, other than one made by the declarant while

- 21 -

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement. Evid.R. 801(C). Detective Hughes did not delve into the contents of Campbell's subsequent statement but only generally referred to it as being consistent with Campbell's trial testimony. Detective Hughes, therefore, did not testify to any out-of-court statement made by Campbell.

{¶ 66} Furthermore, Evid.R. 801(D)(1)(b) provides that a prior consistent statement is not hearsay if "[t]he declarant testifies at trial or hearing and is subject to examination concerning the statement," and the statement is "offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive." "Prior consistent statements that an offering party seeks to introduce to rehabilitate its witness must have been made *before* the alleged influence or motive to fabricate arose to be admissible under this rule." (Emphasis sic.) *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 107.

{¶ 67} The record indicates, and appellant does not dispute, that Campbell made his subsequent statement to Detective Hughes prior to his plea agreement with the state. During his cross-examination of Campbell, defense counsel contended and sought to demonstrate that Campbell had a motive to lie at trial because of the favorable terms of his pretrial plea agreement. "This was an allegation of recent fabrication or improper influence that allowed the state to introduce [Campbell's] prior consistent statement to rehabilitate his testimony." *Lang* at ¶ 110. The trial court, therefore, did not commit plain error by admitting Detective Hughes' testimony that Campbell's subsequent statement was consistent with his trial testimony.

{¶ 68} We note that appellant summarily argues that Detective Hughes' testimony about Campbell's subsequent statement "undermined trial counsel's cross-examination" of

Campbell, "thus impacting [appellant's] Sixth Amendment Right of Confrontation." The Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004). However, "'[w]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.'" *Lang*, 2011-Ohio-4215 at ¶ 113, quoting *Crawford* at 59, fn. 9.

{¶ 69} Campbell testified at trial and was subject to cross-examination. The record shows that appellant did not question Campbell concerning his subsequent statement on either cross-examination or by recalling Campbell to testify following Detective Hughes' testimony. Nothing in the record suggests appellant's cross-examination of Campbell or ability to recall him in order to question him regarding his statement was limited by the trial court. We therefore find the Sixth Amendment right to confrontation was not implicated here. *See State v. Bryant*, 12th Dist. Warren No. CA2007-02-024, 2008-Ohio-3078, ¶ 52.

{¶ 70} We further find that Detective Hughes was not vouching for Campbell's credibility. The detective simply asserted that Campbell's trial testimony was consistent with his subsequent statement to the detective. Her testimony did not assert or suggest that Campbell's trial testimony or subsequent statement was truthful or otherwise believable. Nor did the detective vouch for Campbell's credibility when she testified it is not unusual for gang members to lie during police interviews, including regarding their gang membership. We therefore find no plain error.

{¶ 71} In light of the foregoing, appellant's fourth assignment of error is overruled.

{¶ 72} Assignment of Error No. 6:

**{¶ 73}** THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING IMPROPER HEARSAY EVIDENCE IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHTS OF CONFRONTATION AND TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

**{¶ 74}** Appellant argues the trial court committed plain error when it allowed Detective Hughes to provide hearsay testimony identifying members of the Crips, their role in the gang, and their prior convictions related to their gang activity, including White's conviction for murder and accompanying gang specification.[1]  Appellant asserts that the detective's testimony was solely based upon "what others told her, what she read in a document, and/or what she heard in open court."

**{¶ 75}** Detective Hughes testified, based upon on-the-job training, her gang-related investigations over the years, and completion of various course work within the National Gang Crime Research Center, that she became and is a gang specialist within the Middletown Police Department.  She testified that she is qualified as a gang expert in the Butler County courts, and the trial court took judicial notice of this court upholding Detective Hughes' qualification as a gang expert in *State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313 (upholding White's murder conviction for fatally shooting Davis).  Detective Hughes testified that she spends at least 30 hours per week investigating gangs in Middletown, Ohio, including by monitoring the various social media sites used by gang

---

1. We note that although the heading of this assignment of error refers to the Confrontation Clause, appellant's argument does not address the Clause.  Pursuant to App.R. 12(A)(2) and 16(A)(7), we decline to consider whether Detective Hughes' testimony violated the Confrontation Clause.  *See State v. Patel*, 9th Dist. Summit No. 24024, 2008-Ohio-4692.

members to promote their gang. She first identified the Crips' presence in Middletown in 2002. She testified that she personally filed charges for gang-related felony offenses against White, Cyon Spicer, and Damion Burton, which resulted in convictions for all three men.[2]

{¶ 76} We find no plain error. In 2006, the Ohio Supreme Court rejected a similar hearsay argument in *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084. The supreme court held that a detective's expert testimony concerning the gang activities of a Crip gang and the identification of the defendant and other individuals as members of that gang was neither hearsay nor plain error:

> Detective Lambert properly provided expert testimony on gang activities of the Lincoln Knolls Crips. His identification of the individuals was based upon his personal knowledge and experience in investigating and dealing with the gang and its members. Lambert's testimony was not based upon mere hearsay and speculation. Thus, we hold that Lambert's testimony did not result in plain error.

*Id.* at ¶ 186, citing *State v. Jones*, 10th Dist. Franklin No. 99AP-704, 2000 Ohio App. LEXIS 2496, *16-17 (June 13, 2000). *See also State v. Keith*, 8th Dist. Cuyahoga No. 104034, 2017-Ohio-1545 (detective's identification of gang members not hearsay testimony where based on detective's personal knowledge, investigation, and interviews of the gang members).

{¶ 77} Likewise, Detective Hughes' testimony was based upon her personal knowledge and experience in extensively investigating and dealing with the Crips and its two sub-gangs, the Roadrunners and the 8-ball mafia. Her testimony was not based upon mere hearsay or speculation and did not result in plain error. *Drummond* at ¶ 186.

---

2. In our discussion of the first and second assignments of error, we will address in greater detail appellant's claims that Detective Hughes' testimony concerning these prior convictions was inadmissible hearsay and otherwise required proof in the form of certified judgment entries of conviction.

{¶ 78} Appellant's sixth assignment of error is overruled.

{¶ 79} Assignment of Error No. 8:

{¶ 80} THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING TESTIMONY FROM A STATE EXPERT IN VIOLATION OF OHIO CRIMINAL RULE 16(K), THEREBY DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 81} Appellant argues the trial court committed plain error by allowing Detective Hughes' expert testimony on matters that went beyond the scope of her written report.

{¶ 82} Crim.R. 16(K) requires that expert witnesses generate written reports summarizing their testimony, findings, analysis, conclusions, or opinion and that those reports be disclosed to the opposing party no later than 21 days before trial. "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." *Id.* The Ohio Supreme Court recently held it was error to admit a coroner's expert testimony on the victim's time of death and a glove-buckle comparison because those topics were not set forth in the coroner's written autopsy report in violation of Crim.R. 16(K). *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, ¶ 58-59 (but ultimately finding harmless error in the trial court's admission of the coroner's testimony that went beyond the scope of her autopsy report because the remaining evidence adduced by the state established the defendant's guilt beyond any reasonable doubt).

{¶ 83} The state presented Detective Hughes as an expert witness on gang activity in Middletown, Ohio. Her report was provided to defense counsel as required under Crim.R. 16(K). The report, however, was not filed with the trial court, was not an exhibit at trial, and was not otherwise presented to the trial court for consideration. In June 2022, we denied

- 26 -

appellant's motion to supplement the record on appeal with Detective Hughes' report because the report was never before the trial court. *State v. Kyles*, 12th Dist. Butler No. CA2021-11-141 (June 2, 2022) (Entry Denying Motion to Supplement the Record on Appeal). We subsequently granted the state's motion to strike Detective Hughes' report as appended to appellant's brief, as follows: "Because Detective Hughes' report is not properly part of the record on appeal, the report as appended to appellant's brief is hereby STRICKEN and will not be considered by the court when deciding this appeal." *State v. Kyles*, 12th Dist. Butler No. CA2021-11-141 (June 28, 2022) (Entry Granting Motion to Strike Expert Report Appended to Appellant's Brief and Portions of Appellant's Brief Relying on the Report).

{¶ 84} In light of the foregoing entries and because "appellate review is strictly limited to the record, and this court cannot consider matters outside of the record that were not part of the trial court's proceedings," and because the report was never part of the record below and there was no objection to Detective Hughes' testimony, we find no plain error and therefore presume the regularity of the proceedings. *State v. Thomas*, 12th Dist. Butler No. CA2012-11-223, 2013-Ohio-4327, ¶ 33; *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus.

{¶ 85} Appellant's eighth assignment of error is overruled.

{¶ 86} Assignment of Error No. 9:

{¶ 87} TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO IMPROPER VOIR DIRE; BY FAILING TO OBJECT TO THE JURY CHARGE AND REQUEST AN ACCOMPLICE INSTRUCTION, UNDER R.C. 2923.03(D); BY FAILING TO OBJECT TO IMPROPER EXPERT TESTIMONY AND OPINIONS ON CREDIBILITY; BY FAILING TO OBJECT TO IMPROPER TESTIMONY AND COMMENT [ON] APPELLANT'S

POST-ARREST, POST-*MIRANDA* SILENCE; BY FAILING TO OBJECT TO INADMISSIBLE HEARSAY; AND BY PERMITTING APPELLANT TO APPEAR IN JAIL GARB. THESE DEFICIENCIES DEPRIVED APPELLANT OF EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

**{¶ 88}** Appellant argues that his trial counsel was ineffective because, as referenced in his third through eighth assignments of error, "trial counsel failed to object and/or correct the following substantive errors at trial: improper jury instructions omitting the accomplice instruction under RC. 2923.03(D); Hughes's improper expert and law enforcement opinions on the credibility of Campbell; improper testimony, comments, and arguments on [appellant's] post-arrest, post-*Miranda* silence; improper hearsay testimony that sought to establish essential elements of the offenses; [appellant's] appearance at trial wearing jail garb; and Hughes's expert testimony in violation of Crim.R. 16(K)."

**{¶ 89}** To establish ineffective assistance, appellant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62. The failure to make an adequate showing on either prong is fatal to appellant's ineffective assistance of counsel claim. *In re T.D.*, 12th Dist. Brown No. CA2021-07-009, 2022-Ohio-562, ¶ 19.

**{¶ 90}** Even if we were to assume deficient performance, appellant cannot show any resulting prejudice from trial counsel's failure to object to and correct the foregoing "substantive errors at trial," given our resolution in appellant's third through eighth

assignments of error that no plain error was committed. *See State v. Davis*, 12th Dist. Warren No. CA2017-11-156, 2018-Ohio-2672; *State v. Toudle*, 8th Dist. Cuyahoga No. 98609, 2013-Ohio-1548.

{¶ 91} Appellant's ninth assignment of error is overruled.

{¶ 92} Assignment of Error No. 1:

{¶ 93} THE TRIAL COURT IMPROPERLY DENIED APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 94} Assignment of Error No. 2:

{¶ 95} APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

{¶ 96} In his first and second assignments of error, appellant challenges his convictions for participating in a criminal gang and the gang specification accompanying the aggravated murder, murder, aggravated robbery, and aggravated burglary charges, arguing that the trial court erred by denying his Crim.R. 29(A) motion for acquittal based on insufficient evidence and that his convictions are against the manifest weight of the evidence. Appellant raises two issues for review.

{¶ 97} The review of a trial court's denial of a Crim.R. 29 motion for acquittal is governed by the same standard as that used for determining whether a verdict is supported by sufficient evidence. *State v. Harner*, 12th Dist. Brown No. CA2019-10-012, 2020-Ohio-

3071, ¶ 11. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Peyton*, 12th Dist. Butler No. CA2015-06-112, 2017-Ohio-243, ¶ 41. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* In other words, the test for sufficiency requires a determination as to whether the state has met its burden of production at trial. *Id.*

{¶ 98} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *Id.* at ¶ 42. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 99} Appellant was convicted of participating in a criminal gang in violation of R.C. 2923.42(A), which provides

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 100} Criminal conduct, as defined in R.C. 2923.41(C), includes criminal damaging. Thus, the state was required to prove that appellant was in a criminal gang that was engaged in a pattern of criminal gang activity when he committed criminal damaging by burning the teddy bear of another without the other person's consent.

{¶ 101} Pursuant to R.C. 2941.142, appellant was also convicted of the gang specifications attached to the aggravated murder, murder, aggravated robbery, and aggravated burglary charges. That statute allows a trial court to impose a mandatory prison term of one to three years upon an "offender who committed a felony that is an offense of violence while participating in a criminal gang." Aggravated murder, murder, aggravated robbery, and aggravated burglary are offenses of violence under R.C. 2901.01(A)(9). The state was therefore required to prove that appellant committed those offenses while participating in a criminal gang.

{¶ 102} In his first issue for review, appellant argues that the state failed to prove he was in a "criminal gang" that was engaged in a "pattern of criminal gang activity."

{¶ 103} R.C. 2923.41(A) defines "criminal gang" as

> an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:
>
> (1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
>
> (2) It has a common name or one or more common, identifying signs, symbols, or colors.
>
> (3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.

{¶ 104} Pursuant to R.C. 2923.41(B)(1), "pattern of criminal gang activity" means that

persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:

(a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;

(b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;

(c) A violation of section 2907.04, 2909.06, 2911.211, 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, section 2925.03 of the Revised Code if the offense is trafficking in marihuana, or section 2927.12 of the Revised Code.

{¶ 105} R.C. 2923.41(B)(2) further qualifies what is necessary for a "pattern of criminal gang activity" by providing that

There is a "pattern of criminal gang activity" if all of the following apply with respect to the offenses that are listed in division (B)(1)(a), (b), or (c) of this section and that persons in the criminal gang committed, attempted to commit, conspired to commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:

(a) At least one of the two or more offenses is a felony.

(b) At least one of those two or more offenses occurs on or after January 1, 1999.

(c) The last of those two or more offenses occurs within five years after at least one of those offenses.

(d) The two or more offenses are committed on separate occasions or by two or more persons.

{¶ 106} Thus, the elements of a "pattern of criminal gang activity" are: (1) commission of two or more of any of the offenses listed in R.C. 2923.41(B); (2) at least one of the offenses is a felony; (3) at least one of the offenses was committed on or after January

1, 1999; (4) the most recent offense occurred within five years of one of the other offenses; and (5) two or more of the offenses were committed on separate occasions or by separate persons.

{¶ 107} Appellant asserts that the state failed to establish the Roadrunners' "primary activity" under R.C. 2923.41(A) and what R.C. 2923.41(A) predicate offenses were committed by the various Roadrunners identified by Detective Hughes. Appellant further argues that proof of R.C. 2923.41(B)(1) predicate offenses required certified copies of judgment of convictions for those offenses.

{¶ 108} We summarily reject appellant's assertion that proof of the commission of the gang-related predicate offenses required certified copies of judgment of convictions. R.C. 2923.41(B) does not require that there be a conviction of any of the R.C. 2923.41(B)(1) predicate offenses to support a finding of a "pattern of criminal gang activity." Rather, the plain language of the statute simply requires proof that gang members "committed" or "attempted to commit" the predicate offenses. Had the legislature wanted to impose a duty on the state to prove a conviction for the predicate offenses, it could have done so. It did not. *See State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969.

{¶ 109} Detective Hughes, a gang expert on Middletown, Ohio gangs, testified that the Crips are a criminal gang with two sub-gangs, the Roadrunners and the 8-ball mafia; that commission of a violent crime is a rite of initiation into the gang; and that unlike its rival the Bloods, a criminal gang whose primary activity is drug dealing, the Crips commit homicides, robberies, and burglaries. Robberies and burglaries are listed in R.C. 2923.41(B)(1) and are felony offenses. The detective identified the Crip colors as black and blue, and described hand signs used by Crip gang members, including "C" for Crip and middle finger to thumb for "Blood killer." A photograph taken on the day of the murder

shows appellant, Pawlowski, Campbell, and Boggs; both appellant and Pawlowski are displaying the Crip "Blood killer" sign. Appellant was likewise flashing the Crip "Blood killer" hand sign during his Facebook live stream in May 2019. A blue bandanna and blue cellphone were recovered as property of appellant. The detective also testified that gang members commonly wear Nike Air Force shoes, the same type of shoes retrieved from Pawlowski's home and worn by Stewart's killer as seen on the surveillance video.

{¶ 110} Detective Hughes testified, and evidence at trial showed, that (1) appellant, Pawlowski, Boggs, Campbell, and White were Crip gang members; (2) in 2019, appellant was a Roadrunner who was trying to join the 8-ball mafia and consequently robbed and killed Stewart, a Blood gang member, for that purpose; (3) other Roadrunners included White, Boggs, Spicer, and Campbell; (4) in 2019, Pawlowski was the leader/shot caller for the 8-ball mafia, and Spicer was the shot caller for the Roadrunners; and (5) the detective personally filed gang-activity-related felony charges against three Crip gang members that resulted in felony convictions in 2017 and 2018: Spicer for participating in a criminal gang, Burton for participating in a criminal gang, and White for the murder of a Blood gang member, with a gang specification. Murder is an offense of violence under R.C. 2901.01(A)(9), and participating in a criminal gang is a felony offense under R.C. 2923.42(B).

{¶ 111} Appellant confessed that he had been a Crip Roadrunner for about four years, that Pawlowski, Campbell, and Boggs were Crip gang members, that he was "brothers" with White, and that he killed Stewart to "earn his stripes" in the 8-ball mafia sub-gang because the Crips "want to have a body on everybody's record." Appellant admitted in his statements to police that the Middletown Crips had recently committed several robberies and home invasions.

{¶ 112} Detective Hughes' testimony concerning the convictions of Spicer, Burton, and White was not hearsay as appellant contends in his sixth assignment of error. As noted above, proof of a "pattern of criminal gang activity" requires that the state establish that certain offenses were "committed," not that convictions for those offenses were obtained. The concepts of "commission" of an offense and "conviction" of the offense are distinct. The former refers to the conduct constituting the offense while the latter refers to a judicial determination of guilt. We reiterate that Evid.R. 801(C) defines "hearsay" as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement. Detective Hughes' testimony that other Crip gang members had been convicted of certain gang-related offenses was not offered to prove that they had been "convicted" of those offenses (i.e., judicially determined to be guilty). Detective Hughes' testimony was offered to prove that they had committed the offenses (i.e., engaged in a conduct constituting the offenses). In this sense, Detective Hughes' testimony that other Crip gang members had been "convicted" of certain predicate offenses to prove that they had "committed" those offenses does not offend the hearsay rule. Pursuant to *Drummond*, Detective Hughes' testimony "was based upon h[er] personal knowledge and experience in investigating and dealing with the [Middletown Crips] and its members" and was neither hearsay nor speculation. *Drummond*, 2006-Ohio-5084 at ¶ 186.

{¶ 113} In light of the foregoing, we find that the state presented sufficient evidence that appellant was an active member of a criminal gang, the Crips, that he had knowledge the Crips were engaged in a pattern of criminal gang activity, and that he purposely engaged in an act that constitutes criminal conduct under R.C. 2923.41(B) by burning the teddy bear he had removed from a memorial for a rival gang member, an act plainly motivated by or

related to appellant being a Crip gang member. We further find that the state presented sufficient evidence that Crip gang members committed several offenses enumerated in R.C. 2923.41(B)(1) and that any such crimes met the additional criteria set forth in R.C. 2923.41(B)(2). Thus, the state presented sufficient evidence to establish that appellant was in a "criminal gang" that was engaged in a "pattern of criminal gang activity."

{¶ 114} In his second issue for review, appellant argues the state failed to prove he committed criminal damaging in violation of R.C. 2909.06 when he removed the teddy bear from Davis' memorial and subsequently live streamed his burning it in his house. Specifically, appellant asserts the state failed to prove (1) that the teddy bear was the property of another and not abandoned, (2) that appellant burned the teddy bear without the other person's consent, and (3) that Davis' memorial on "Woodland" and appellant's home on "Lewis" were located in Butler County.

{¶ 115} The state did not present direct evidence of who owned the teddy bear or whether appellant lacked the owner's consent to burn the bear. However, lack of consent to damage may be proved by circumstantial evidence. *State v. Baldwin*, 9th Dist. Medina No. 10CA0078-M, 2011-Ohio-4988, ¶ 15. Construing the evidence in a light most favorable to the prosecution, the circumstances under which appellant obtained and burned the teddy bear support the predicate offense of criminal damaging. It is undisputed the teddy bear was not appellant's property. There was circumstantial evidence that the teddy bear was placed at White's memorial to serve as an expression of grief and loss for White's demise. Evidence showed that the teddy bear was in good condition and that it had been deliberately affixed to the memorial among other mementos, thus indicating the owner's intent for it to remain at the memorial. The teddy bear was no more abandoned than flowers left at a loved one's gravesite. The circumstances further suggest that the person who placed the

teddy bear did not give consent to a Crip gang member such as appellant, any other rival gang member, or a friend of White to burn the memento in a display of disrespectful live broadcast. We therefore conclude that the jury could reasonably find that appellant caused harm to the property of another without the other person's consent.

{¶ 116} Appellant failed to object to venue at trial and thus has waived all but plain error. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 142. Venue is not a material element of any offense charged. *Id.* at ¶ 143. The elements of the offense charged and the venue of the matter are separate and distinct. *Id.* Nevertheless, venue is a fact that must be proved beyond a reasonable doubt unless it is waived by the defendant. *Id.* Trial courts have broad discretion to determine the facts that would establish venue. *Id.* at ¶ 144. Venue need not be proven in express terms; it may be established either directly or indirectly by all the facts and circumstances of the case. *Id.*

{¶ 117} Evidence was presented that appellant took the teddy bear from the memorial on Woodlawn and brought it to his home on "Lewis" where he burned it, that the memorial was on Woodlawn Avenue where White killed Davis, and that White was prosecuted in Butler County, Ohio for that murder. During police interviews, appellant confirmed he lived at "618 Louis Place" and his GPS ankle monitor placed him at "618 Louis Place, Middletown, Ohio" on the morning of October 12, 2019. We therefore find that venue was properly established in Butler County, Ohio, and no plain error occurred.

{¶ 118} In light of all of the foregoing, we find that appellant's convictions for participating in a criminal gang and for the gang specification accompanying the aggravated murder, murder, aggravated robbery, and aggravated burglary charges are supported by sufficient evidence and the trial court did not err in denying appellant's Crim.R. 29(A) motion for acquittal. We further find that appellant's convictions are not against the manifest weight

of the evidence. Given the evidence presented at trial, the jury did not lose its way and create such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. Appellant's first and second assignments of error are accordingly overruled.

**{¶ 119}** Judgment affirmed.

S. POWELL and PIPER, JJ., concur.